Drake, Ok. J.,
delivered the opinion of tbe court:
This is an action to recover damages for an alleged breach of contract, based on the following facts:
On the 31st day of October, 1868, the Quartermaster General of the United States Army published an advertisement, of which the material parts are as follows:
1. “ Sealed proposals will be received at the office of the Quartermaster General, Washington, D. C., until November 30, 1866, for furnishing cast-iron head-blocks for national cemeteries, delivered in quantities about as follows, viz.” (Here follows in the advertisement a long list of cemeteries, with the number of head-blocks deliverable at each, and specifications of their dimensions, &c.)
5. “Bach bid must be accompanied by good and sufficient-guarantee, of at least two responsible parties, that the contract, if awarded, will be faithfully and promptly executed.
6. “ The government reserves to' itself the right to reject all bids if unsatisfactory, and to delay the award not later than the 1st of January, 1867.”
The claimants put in a bid under said advertisement, which, upon the opening of all the bids, was found to be the lowest.
Their bid was accompanied with the guarantee of Harriet Donohue and Charles H. Anderson, “ that if the contract for furnishing head-blocks to the government be awarded to Messrs. 'Samuel Strong and William J. Donohue, they will carry out the same in good faith.”
On the 14th of December, 1866, the Quartermaster General communicated by letter to the Secretary of War the fact that the claimants were the lowest bidders for the whole of said head-blocks, and in said letter wrote as follows :
“AsMessrs. Strong & Donohue are not known tobe practical iron-founders, and as the.persons they offer as sureties are not known to this department as men of well-known and established means and responsibility, should it be decided to accept their bid, I recommend that they be required to name, for approval of the War Department, the parties who have engaged to furnish the material and to do the work, and that they be required to furnish security, by a bond signed by persons well known as fully able to meet its obligation, in an amount equal to two-thirds of the estimated amount of the contract — say $240,000 — conditioned that the amount of the bond shall be paid and forfeited *142 to tbe United States if tbe contract is not fulfilled to tbe letter, and also tbat those sureties shall join in tbe execution and signature of tbe contract as parties thereto.”
On tbe 20th of December, 1800, tbe claimants notified tbe Quartermaster G-eneral by letter tbat they were then prepared to enter into contract for tbe said bead-blocks ; tbat John G, Treadwell and Storm -V. Boyd, of Albany, New York, would enter into tbe contract; and offering as sureties three persons, who, they said, would qualify for tbe sums set opposite their respective names, amounting in tbe aggregate to $240,000.
On tbe same day tbe Quartermaster General inclosed tbe letter of claimants to tbe Secretary of War, saying tbat if. tbe list of sureties should prove satisfactory, be was of opinion tbat it would be safe and proper to award tbe contract to tbe claimants, Messrs. Treadwell and Boyd uniting with them in the execution of tbe contract, and tbe sureties named uniting in tbe execution of tbe bond of security in tbe amount of $240,000. lie further stated tbat Messrs. Treadwell and Boyd bad called upon him, and be believed them to -be persons of competent experience and skill, as iron-founders, to execute tbe work; which met tbe objection of bis report submitting tbe bids — tbat tbe bidders themselves did not appear to be practical iron-founders; and be therefore recommended tbat a contract and bond be prepared for signature, and tbat tbe parties be advised tbat, upon the execution, in due form, of said contract and bond, tbe work should be awarded to them.
No action declarative of acceptance or rejection of tbe claimants’ bid was taken by tbe War Department, nor was any other bid for tbe work accepted.
In December, 1808, tbe claimants memorialized the Secretary of War for tbe execution of a contract in accordance with their bid, and for his order to proceed with the work; which being-refused, they brought this suit, claiming (with nice accuracy of calculation) $150,993 33 as damages, which sum they allege would have been their “clear profit” upon tbe work if they bad been allowed to do it.
Such, in its material facts, is the case as presented by tbe claimants themselves, no evidence having- been offered in behalf of tbe defendants. Upon those facts, we have no hesitation in arriving- at tbe conclusion, upon tbe following grounds, tbat tbe claimants have no right of action.
*143 Iii the first place, not only was tliere in I860 no law authorizing the Quartermaster General or the Secretary of War to enter into a contract for the expenditure of money for cast-iron head-blocks for the national cemeteries, bat there was in the Act 2cl March, 1801, (111 Stat. L., 214, 220,) express law to the contrary, in the following words:.
“ No contract or purchase shall hereafter be made, unless the same be authorized by law, or be under an appropriation adequate to its fulfilment, except in the War and Navy Departments, for clothing, subsistence, forage, fuel, quarters, or transportation, which, however, shall not exceed the necessities of the current year.”
To obviate the force of this clear prohibition the claimants’ brief relies upon the eighteenth section of the Act 17 ih July, 1802, (12 Stat. L., 596,) which declares—
“ That the President of the United States shall have power, whenever in his opinion it shall be expedient, to purchase cemetery grounds, and cause them to be securely inclosed, to be used as a national cemetery for the soldiers who shall die in the service of the country.”
This confers no authority in regard to national cemeteries, except to purchase the grounds and cause them to be'securely inclosed, and is wholly inapplicable to this case.
To the same end, and with special reference to the prohibition of the making of any contract not authorized by law, “ unless under an appropriation adequate to its fulfilment,” we are cited to the Act 28th July, 1SCG, (14 Stat. L., 310,) wherein is an appropriation of $50,000 “to establish national cemeteries, and to purchase sites for the same, at such points as the President of the United States may deem proper, and for the care of the sameand this is claimed by claimants’ counsel as “ adequate to the fulfilment of the contract.” Aside from the restriction of this appropriation, by its terms, to the “purchase” and “care” of sites for national cemeteries, (which could hardly be considered as including head-blocks for the graves,) it is not easy to see by what arithmetical process $50,000 would be “adequate to the fulfilment of a contract” requiring, on the basis of the claimants’ bid, au expenditure of $360,000.
In further effort to escape the effect of the prohibition in the Act 2cl March, 1861, the uAct to establish and to protect national cemeteries,” February 22, -1867, (14 Stat. L., 39!),) is cited, in *144 wbicb is an appropriation of $750,000, “to carry out tbe purposes of this act;” tbe first section of wbicb is in tbe following’ words:
“That in tbe arrangement of tbe national cemeteries established for tbe burial of deceased soldiers and sailors, tbe Secretary of War is hereby directed to have tbe same inclosed with a good and substantial stone or iron fence,- and to cause each grave to he marked with a small head stone or hloelc, with tbe number of tbe grave inscribed thereon, corresponding with tbe number opposite tbe name of tbe party in a register of burials to be kept at each cemetery and at tbe office of tbe Quartermaster General, wbicb shall set forth tbe name, rank, company, regiment, and date of death of tbe officer or soldier; or, if unknown, it shall be so recorded.”
This act, passed in February, 1867, is claimed to have conferred power upon tbe Secretary of War to enter into the con-tract with tbe claimants, for tbe breach of wbicb they demand •damages in this action, and wbicb they insist upon their right to have bad executed between them and the War Department in December, 1866, when there was no lawful authority for its execution, and they were bound to know that there was none. Even admitting that after its passage there was authority in that department to make a contract for bead-blocks for tbe national cemeteries, that could in no sense relate back and ■confer a right upon these claimants to tbe execution of tbe contract for wbicb they bid in tbe previous November; for until tbe Secretary of War was authorized by law to make such .a contract, be bad no power to invite proposals therefor. His power in that respect came into existence with tbe act of February 22,1867, and tbe proposals issued by tbe Quartermaster General in tbe previous October were without authority of law. Tbe claimants, therefore, are in tbe position of demanding damages for tbe refusal to award them a contract w-hicli was not only unauthorized by any law, but prohibited by express law, and wbicb before they bid, as well as after, they were bound to know was both unauthorized and prohibited.
Tbe foregoing views are necessarily fatal to tbe claimants’ ■case, and would justify our not noticing any other point in it; but there are two others wbicb, as they are in tbe record, may properly be referred to.
It is insisted by claimants’ counsel, that tbe mere fact of tbe *145 Quartermaster General’s report to the Secretary of War that they were the lowest bidders, not only entitles them to the contract, but was in itself a contract on the part of the United States with them for the head-blocks bid for. •
If this were so, why should they have demanded the contract of the War Department, as they did? If the contract was already formed by the fact of the Quartermaster General’s report, why did they not proceed immediately to do the work Í Why,, after inaction for two years, did they invoke the- Secretary of War to order the contract to be executed and the work to proceed ? These questions cannot be answered.
The fact is, that in law there was no contract until it should be aioardeil to a particular person. In the Quartermaster General’s proposals there was no engagement to award the contract to the lowest bidder; on the contrary, the declaration was therein made that “the government reserves to itself the right to reject all bids if unsatisfactory.”1
The xiroposals required each bid to be accompanied by the guarantee of at least two responsible parties “that the contract, if awarded, will be faithfully and promptly executed and the government reserved to itself “the right to delay the award not later than the 1st of January, 1867.” Thus, there was to be an award of the contract — a judicial assignment of it to such one of the bidders as the officer of the government charged with the award might decide to have made a satisfactory bid, which he was willing to accept as the basis of the contract. It is not contended, nor could it be, that there was any award of the contract in this case; nor was there any obligation to award it to any one. The whole matter rested in the discretion of the Secretary of War, and he did not exercise that discretion in favor of the claimants; and that was the end of the matter.
It is, however, urged that because no rejection of claimants’ bid was declared in terms, it was accepted, and the contract thereby formecl, and that they are therefore entitled to damages for its non-fulfilment. This view assumes the necessity, in order to constitute a rejection of a bid, of announcing-in express language its rejection; ah assumption which cannot be sustained. The acceptance of a bid must be announced, so' as to notify the bidder to enter into the required contract; but the rejection of a bid need not be; the absence of announce *146 ment of its acceptance, witbin the time designated therefor, is its rejection; and the rejection, whether pronounced or silent, is conclusive evidence that the bid was “ unsatisfactory.v
' In every view the case is against the claimants, and their petition is therefore dismissed.